NEW JERSEY SPORTS PRODUCTIONS, INC., d/b/a Main Events, Plaintiff,

v.

DON KING PRODUCTIONS, INC., Oliver McCall, Jimmy Adams, Time Warner Entertainment Co, L.P., Nevada Athletic Commission, a division of the Nevada Department of Labor and Industry, and John Does 1–5, Defendants.

No. 97–Civ–1175 (WGB).

United States District Court, D. New Jersey.

July 21, 1998.

**536**

Patrick C. English, Dines & English, Clifton, NJ, for Plaintiff New Jersey Sports Productions, Inc.

Pamela Labaj, Curtis, Mallet–Prevost, Colt & Mosle, Newark, NJ, for Defendant Don King Productions, Inc.

Andrew Muscato, Whitman Breed Abbott & Morgan, Newark, NJ, Eckley M. Keach, Goodman, Chesnoff & Keach, Las Vegas, NV, for Defendant Oliver McCall.

## OPINION

BASSLER, District Judge.

Plaintiff, New Jersey Sports Productions, Inc, d/b/a Main Events ("Main Events") moves for an Order: (1) permitting Main Events to pay into the Court registry the sum of $3,003,923.04 together with accrued interest, in connection with an interpleader action brought by Main Events; (2) restraining any other actions affecting the funds involved in this interpleader (except a disciplinary action brought by the Nevada Athletic Commission ("NAC") against the Defendant, Oliver McCall ("McCall")); and (3) directing that claims on the alleged fund be filed. Main Events asserts jurisdiction pursuant to 28 U.S.C. § 1332 (diversity of citizenship). For the reasons set forth below, the Court **grants** Main Events' motions seeking an Order: (1) permitting Main Events to pay into the Court registry the sum of $3,003,923.04 together with accrued interest, in connection with an interpleader action brought by Main Events; (2) directing that claims on the alleged fund be filed; and (3) restraining any other actions affecting the funds involved in this interpleader (except a disciplinary action brought by the NAC against McCall).

## I. BACKGROUND

The central events of this lawsuit concern a heavyweight title bout between McCall and Lennox Lewis that took place on February 7, 1997. McCall's purse for the fight was agreed to be $3,075,500.00. (Complaint Ex. B ¶ 2).[1]

---

1. The fight only took place after protracted litigation in the New Jersey Superior Court, Chancery Division. *See* Complaint ¶¶ 15 *et seq.*

Main Events, the promoter of the bout, entered into two contracts with McCall and his manager, Defendant Jimmy Adams ("Adams"). Under the first of these contracts, the World Boxing Council Official Championship Bout Contract ("WBC Contract"), McCall agreed to, among other things, refrain from the use of drugs. (Complaint Ex. A ¶ 7).[2] According to Main Events' Complaint, McCall thereafter was arrested on drug charges. (Complaint ¶ 44). Furthermore, McCall agreed to cooperate and assist Main Events in promoting the bout. (WBC Contract, attached as Ex. A to Complaint, ¶ 11). According to the Complaint, McCall breached this obligation by refusing to cooperate with Main Events in promoting the bout.[3]

McCall and Main Events[4] entered into a second contract titled, "Official Boxing Contract, Nevada Athletic Commission" (the "NAC Contract"), which provided that McCall would not be entitled to the purse if the NAC determined that McCall did not engage in honest competition or give an honest exhibition of his skills. (Complaint Ex. B ¶ 3).

Paragraph 3 of the NAC Contract provides, in part:

[The parties agree] [t]hat the contest ... shall be conducted in all respects in conformity with the laws of the State of Nevada, and the rules and regulations adopted by the Nevada Athletic Commission, which are hereby made a part of this agreement. ... If the referee or the Nevada Athletic Commission shall decide that the Boxer and Manager, or either of them, did not enter into the contract in good faith; or the Boxer and Manager, or either of them, had any collusive understanding or agreement regarding the termination of the

match other that the same should be an honest exhibition of skill on the part of the contestants, or that the Boxer is not honestly competing or did not give an honest exhibition of his skill, or is guilty of an act detrimental to the interest of boxing; it is agreed in any of such events that the Boxer shall not be entitled to the compensation above named, or any part thereof, unless so ordered by the Nevada Athletic Commission.

It is further agreed that the Promoter [Main Events] shall pay said compensation to the said Commission in the event the Commission shall so order upon any of the above-mentioned grounds. The Commission shall thereupon, in its discretion, make such disposition of said purse as it deems to the best interest of legitimate sport and may forfeit to the Nevada Athletic Commission all or any part of the compensation or order the same or any portion thereof paid to the Boxer. All parties hereto agree to accept and be bound by the decision of the said Commission and such decision shall be final and conclusive of the rights of the parties hereto.

According to the Complaint, DKP, purportedly on behalf of McCall, demanded that a letter of credit be provided to DKP in McCall's name. (Complaint ¶ 30). The Complaint further alleges that Main Events procured a letter of credit in the amount of $2,983,997, which was provided to DKP in McCall's name. (*Id.*).[5] The letter of credit expired, by its terms, on March 7, 1997. (Complaint ¶ 31). No parties have drawn against the letter of credit; the funds representing McCall's disputed purse are kept in a segregated, interest-bearing account in Ber-

2. Although it is not entirely clear from either the WBC contract itself or Main Events' pleadings in this case, it appears that the WBC Contract is dated November 26, 1994.

3. It appears from the allegations in the Complaint that McCall viewed Don King Productions, Inc. ("DKP") as McCall's exclusive promoter, (Complaint ¶ 35), and requested that all inquiries from Main Events regarding promotional activities in connection with the bout be directed through DKP. (*Id.* ¶ 36).

4. Although the NAC contract refers to Mr. Adams, the copy appended to the Complaint at Exhibit B does not contain Mr. Adams's signature.

5. According to the Complaint, the difference between the amount of the letter of credit and the full purse of $3,075,550 represents sanction fees owed by McCall and paid to the WBC by Main Events on McCall's behalf. (Complaint ¶ 30).

gen Commercial Bank under Main Events's control. (Complaint ¶ 51).

According to the Complaint, McCall simply stopped fighting after the third round of the bout. (Complaint ¶ 48). As a result, the referee stopped the bout fifty-five seconds into the fifth round. (*Id.*). Main Events alleges that McCall's actions breached both the NAC Contract and WBC Contract. (Complaint Count II).[6]

On February 7, 1997, shortly after the bout was stopped, the Nevada Athletic Commission notified Main Events that McCall breached the terms of his agreements and that he should not be paid the approximately $3 million provided for in the contracts between the parties. On February 18, 1997, the Nevada Attorney General's Office initiated a disciplinary action before the Nevada Athletic Commission seeking the imposition of fines totaling ten percent of McCall's purse and the revocation of McCall's Nevada boxing license. (Plaintiff's Moving Brief Ex. B ¶¶ 15–18).

On April 1, 1997, approximately 20 days after the Complaint in this action had been filed, McCall and the Nevada Attorney General's Office entered into a settlement agreement (the "Settlement"), a copy of which is attached to the Certification of Eckley M. Keach at Exhibit 3. According to the terms of the Settlement, McCall admitted that the manner and method in which he conducted himself was detrimental to boxing. (Settlement ¶ 1). McCall further agreed to pay a $250,000 fine to the State of Nevada and to suffer a one-year suspension from boxing in

Nevada to commence *nunc pro tunc* February 7, 1997. (Settlement ¶¶ 3–4).

The Settlement must be approved by the NAC before it becomes final. (Settlement ¶ 9). The Settlement provides that the parties' agreement will be placed on the agenda of the next scheduled meeting of the NAC, which had been scheduled for April 26, 1997. (Settlement ¶ 10; Keach Cert. ¶ 5). (The parties, at oral argument, revealed that at the April 26, 1997 meeting, the NAC postponed consideration of the McCall Settlement). The Attorney General agreed to recommend that the NAC approve the Settlement. (Settlement ¶ 10). The Attorney General also agreed to recommend that the NAC order that McCall receive the remaining monies due him, less and except the $250,000 fine, as per the WBC and NAC contracts. (*Id.*).[7]

Main Events indicates, in its reply brief, that, while it was aware of the pendency of the NAC hearings, Main Events was not a party to the settlement negotiations and in no way participated in them. (English Aff. ¶ 8). Nor, it would appear, were any parties other than McCall and the NAC privy to the proposed settlement terms.

According to the Complaint, possible claimants to the disputed purse include:

(A) McCall, who allegedly claims that he is due the entire purse;

(B) DKP, which has also raised a claim to part of McCall's purse;[8]

(C) Time Warner Entertainment, Co., L.P. ("Time Warner"), which, through its broadcast division, Home Box Office, Inc., broadcast the bout;[9]

---

6. Main Events' Complaint contains four counts. Count One seeks to invoke the interpleader jurisdiction of this Court. Count Two alleges breach of contract by McCall. Count Three alleges tortious interference by DKP. Count Four alleges that DKP intentionally misrepresented McCall's physical condition prior to the February 7, 1997 bout.

7. Adding another twist to the already convoluted plot, Main Events questions the authenticity of McCall's signature on the settlement agreement. The settlement purports to have been signed by McCall on April 1, 1997. According to news reports, however, McCall had been involuntarily committed to a mental institution from March 28, 1997 until approximately April 4, 1997, rais-

ing obvious concerns as to his competence to enter into the settlement in question. (*See* English Aff. ¶ 15 and Ex. D).

8. Neither the Complaint nor Main Events's moving papers elaborate on the nature of the possible actions DKP might pursue against the res.

9. Time Warner filed its Counterclaim and Crossclaim in Interpleader on April 22, 1997 alleging that Time Warner advanced the funds at issue to Main Events through a letter of credit in favor of Main Events issued by Societe Generale, a New York bank. (Time Warner Pleading at 13 ¶ 1). Time Warner alleges that, pursuant to a contract entered into between Time Warner and Main Events, Main Events promised to provide a com-

(D) Adams, McCall's manager;

(E) The NAC, which has the power to fine McCall;[10] and

(F) Main Events, which claims that the amount on deposit is not due because of various contract breaches.

(Complaint ¶ 53).

Both DKP and McCall oppose Main Events's application to place the funds on deposit with the Court, to enjoin any other actions affecting the funds (except the pending disciplinary action), and to direct that claims against the fund be filed. They argue: (1) that this Court lacks subject matter jurisdiction over Main Events's interpleader claim; (2) that the interpleader claim is improperly venued in this district; (3) that this Court should abstain from exercising its interpleader jurisdiction in favor of the action pending before the NAC; (4) that the Court lacks personal jurisdiction over McCall; and (5) that the NAC Contract, by its terms, designates the NAC as the exclusive forum to hear these claims.

## II. *DISCUSSION*

Interpleader is an equitable device that enables a party holding a fund to compel persons asserting conflicting claims to that fund to adjudicate their rights to the fund in a single action. *American Family Mut. Ins. Co. v. Roche*, 830 F.Supp. 1241 (E.D.Wis. 1993). The classic interpleader scenario involves a neutral stakeholder, such as an insurance company, faced with completing claims over the rights of the res—*e.g.*, the proceeds of a life insurance policy where the beneficiaries dispute their relative distributions. 7 Charles A. Wright & Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 1701 at 486 (1986 & 1996 supp.). Thus, as originally conceived, interpleader actions were limited to a relatively narrow range of cases. 7 Charles A. Wright & Arthur R. Miller & Mary Kay Kane, *Fed-*

*eral Practice and Procedure* § 1701 at 485 (1986 & 1996 supp.).

Subsequent revisions to the United States Code and the Federal Rules of Civil Procedure have liberalized use of the interpleader device. *See generally Bradley v. Kochenash*, 44 F.3d 166, 168 (2d Cir.1995)(discussing history and evolution of interpleader practice). The key prerequisite to maintaining an action in interpleader presently is that there be two or more claimants to the fund who are "adverse" to each other. 7 Charles A. Wright & Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 1705 at 507–509 (1986 & 1996 supp.). "This requirement is not met where one of the claims clearly is devoid of substance, or one of the claimants is under the control of the stakeholder or has dropped his claim and the fear of multiple litigation or liability is groundless, or the claims are not asserted against the same fund, or the stakeholder may be liable to both claimants." *Id.* at 508–509; *see also CNA Ins. Companies v. Waters*, 926 F.2d 247, 251 (3d Cir.1991)(only if stakeholder has a "bona fide" fear of adverse claims arising with respect to the res does a claim for interpleader arise).

Similarly, to properly invoke the interpleader jurisdiction of the Court, there must exist a limited fund or some specific, identifiable property as to which the claimants and stakeholder need the protection of one lawsuit. 7 Charles A. Wright & Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 1704 at 506–507 (1986 & 1996 supp.).

An interpleader action may be brought in federal court pursuant to two different, yet overlapping, procedural devices. "Rule interpleader" is governed by Fed.R.Civ.P. 22, which states, in pertinent part:

(1) Persons having claims against the plaintiff may be joined as defendants and required to interplead when their claims are such that the plaintiff is or may be

petitive bout between Lennox Lewis and Oliver McCall. (*Id.* ¶ 2). Time Warner further alleges that McCall's alleged breach of his obligations to Main Events to give an honest demonstration of his skills excused Time Warner from satisfying the letter of credit it had previously obtained in favor of Main Events. (*Id.* ¶ 4). Time Warner further alleges that the Societe Generale letter of credit was cashed over Time Warner's objection.

Time Warner thus claims a superior right to the funds at issue. (*Id.* ¶¶ 6–8).

**10.** The Nevada Athletic Commission was dropped from the case on April 2, 1997 apparently on the understanding that the NAC did not intend to make a claim on McCall's purse.

exposed to double or multiple liability. It is not ground for objection to the joinder that the claims of the several claimants or the titles on which their claims depend do not have a common origin or are not identical but are adverse to and independent of one another, or that the plaintiff avers that the plaintiff is not liable in whole or in part to any or all of the claimants . . . .

(2) The remedy herein provided is in addition to and in no way supersedes or limits the remedy provided by Title 28, U.S.C. §§ 1335, 1397 and 2361 . . . .

■ "Statutory interpleader" is governed by 28 U.S.C. §§ 1335, 1397 and 2361. 28 U.S.C. § 1335 provides, in pertinent part:

(a) The district courts shall have original jurisdiction of any civil action of interpleader or in the nature of interpleader filed by any person, firm, or corporation, association, or society having in his or its custody or possession money or property of the value of $500 or more . . . if

(1) Two or more adverse claimants, of diverse citizenship as defined in section 1332 of this title, are claiming or may claim to be entitled to such money or property . . . .

Subject matter jurisdiction under statutory and rule interpleader differs. Under statutory interpleader, the value of the stake need only be $500 and diversity of citizenship need exist only between any two of the adverse claimants. 7 Wright & Miller, *Federal Practice and Procedure* § 1703 at 498. In rule interpleader, on the other hand, jurisdiction must be based on the general statutes governing federal court jurisdiction—*i.e.,* federal question (28 U.S.C. § 1331) or diversity of citizenship (28 U.S.C. § 1332). Thus, if a rule interpleader claimant asserts jurisdiction pursuant to 28 U.S.C. § 1332, complete diversity must exist between the plaintiff stakeholder and the defendant claimants, and the amount in controversy must exceed $75,-000.[11] *Id.*

■ Similarly, the venue rules differ as between rule and statutory interpleader. Statutory interpleader restricts venue to any district in which one or more of the claimants resides. Under rule interpleader, on the other hand, venue is proper in the district where the plaintiff resides, where all the claimants reside, or where the claim arose. *Id.* at 498–99; 28 U.S.C. § 1397; *see also American Family Mut. Ins. Co. v. Roche,* 830 F.Supp. 1241, 1244 n. 2 (E.D.Wis.1993).

### A. DKP's [12] Argument That Venue is Improper in This District

DKP argues that venue is improper in this district. This argument is misplaced.

DKP points out that none of the named defendant-claimants in to the interpleader action reside in this district. DKP argues, therefore, that venue is not proper in this district.

■ The Court concludes that under either statutory or rule interpleader, the District of New Jersey is a proper venue for Main Events's interpleader action.

Under rule interpleader, venue is proper in the district where the stakeholder resides. *See Roche,* 830 F.Supp. at 1244 n. 2. Here, Main Events, according to the Complaint, resides in New Jersey. Therefore, the action is properly venued in this district under rule interpleader.

Venue for statutory interpleader claims is governed by 28 U.S.C. § 1397, which provides that "[a]ny civil action of interpleader or in the nature of interpleader under section 1335 of this title may be brought in the judicial district in which one or more of the claimants reside."

Because none of the defendant-claimants reside in New Jersey, the question arises whether a plaintiff-stakeholder-claimant qualifies as a "claimant" within the meaning of Section 1397. Neither the parties' nor the Court's research has located a case discussing this issue.

---

11. The Complaint improperly pleads the requisite jurisdictional amount as $50,000. The Court notes, however, that the amount in controversy here clearly exceeds the $75,000 threshold.

12. In this Opinion, the Court will refer to DKP and McCall collectively as DKP when discussing their opposition to Main Events's motion.

The Court concludes that "claimant" as used in Section 1397 includes plaintiff-stakeholders who assert a claim on the stake. The Court's conclusion is based on a plain textual reading of the statute, which provides for venue in the district where any "claimant" resides. 28 U.S.C. § 1397. This conclusion follows from the fact that plaintiff-stakeholders may, under section 1335, assert a claim on the stake. *State Farm Fire and Casualty Co. v. Tashire,* 386 U.S. 523, 87 S.Ct. 1199, 18 L.Ed.2d 270 (1967). A natural reading of Section 1397 compels the conclusion that where, as here, a plaintiff-stakeholder asserts a claim against the fund, its residence is relevant for determining whether venue is proper under Section 1397.

B. *DKP's Argument That Interpleader is Improper Because There Exist No Adverse Claims to the Fund*

As stated above, the existence of two or more adverse claims to the fund at issue is a prerequisite to the maintenance of an interpleader action. *See CNA Ins. Companies v. Waters,* 926 F.2d 247, 251 (3d Cir.1991)(only if stakeholder has a "bona fide" fear of adverse claims arising with respect to the res does a claim for interpleader arise).

Main Events has made an adequate showing on this motion that it has a "bona fide" fear of adverse claims relating to McCall's purse.

The Complaint in this action does not specify any theory pursuant to which DKP, who does not appear to be a party to either the WBC or the NAC contracts, could legitimately claim any part of the purse. *See Gaines v. Sunray Oil Co.,* 539 F.2d 1136, 1141–42 (8th Cir.1976)(denying interpleader; "Here, Amtel has not interpleaded a sum represented to be a reasonable commission owing to only one of several competing brokers, or to be divided among them. Rather, it has interpleaded a specific sum arising under a particular agreement to which only Amtel and Sunray were parties.").

Furthermore, there does not appear to be the requisite adversity between the possible claims of McCall and Adams. From a preliminary examination of the contracts at issue, it would appear that Adams's recovery from the purse, if any, would be dependent on McCall's recovery. (WBC Contract ¶ 4) ("Promoter [Main Events] shall pay the Manager [Adams] of the Boxer [McCall] his share of Boxer's compensation, by separate check, in the amount agreed to by Boxer and his manager"). While both McCall and Adams would appear to be adverse to Main Events's position, on the record before the Court it is a stretch to conclude that they have the requisite adversity between themselves for the maintenance of an interpleader action.

Main Events, however, has submitted sufficient evidence that it has a legitimate fear of double liability stemming from dual obligations owing to McCall and Time Warner. Time Warner has asserted a claim against the res by way of counterclaim and cross-claim in interpleader. The Counterclaim and Crossclaim alleges that Time Warner advanced the funds at issue to Main Events through a letter of credit in favor of Main Events issued by Societe Generale, a New York bank. (Time Warner Pleading at 13 ¶ 1).[13] Time Warner alleges that, pursuant to a contract entered into between Time Warner and Main Events, that Main Events promised to provide a competitive bout between Lennox Lewis and Oliver McCall. (*Id.* ¶ 2).[14] Time Warner further alleges that McCall's breaches of his obligation to Main Events to give an honest demonstration of his skills excused Time Warner from satisfying the letter of credit it had previously obtained in favor of Main Events. (*Id.* ¶ 4). Time Warner further alleges that the Societe Generale letter of credit was cashed over Time Warner's objection. Time Warner thus claims a superior right to the funds at issue. (*Id.* ¶¶ 6–8).

This claim, together with McCall's, satisfies the adversity requirement. Significantly, should McCall be found to be entitled to all or part of the purse, as McCall's counsel

---

**13.** The parties have not supplied the Court with a copy of this letter of credit on this motion.

**14.** The contract between Time Warner and Main Events, similarly, has not been made available to the Court on this motion.

alleges is the likely outcome of the NAC proceeding, and this or another court determines that Main Events is liable to Time Warner, Main Events could face double liability arising from the same transaction. Under these circumstances, Main Events has a bona fide fear of adverse claims arising with regard to the contract amounts in dispute. *See CNA Ins. Companies v. Waters,* 926 F.2d 247, 251 (3d Cir.1991)(only if stakeholder has a "bona fide" fear of adverse claims arising with respect to the res does a claim for interpleader arise).[15] Interpleader, therefore, is the appropriate remedy to allay those fears.

### C. *DKP's Argument That This Court Should Abstain in Favor of the Nevada Action*

DKP also argues that this Court should abstain in favor of ongoing proceedings before the NAC.

■ When a court determines that a state action commenced earlier provides an adequate remedy, the proper course is to deny the motion to interplead. 7 Charles A. Wright & Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 1709 at 534 n. 9 (1986 & 1996 supp.)("[A] court may dismiss or stay an interpleader proceeding if an action already pending before another court might obviate the need for employing the interpleader remedy or eliminate the threat of multiple vexation. This certainly would be the case if the disputed issues are likely to be resolved in the other

proceeding."); *Truck–A–Tune, Inc. v. Re,* 856 F.Supp. 77, 82 (D.Conn.1993).

■ Here, however, the disputed issues are not likely to be resolved by proceedings before the NAC. It appears that the issue of who owns the funds at stake is under consideration by the NAC, as per the NAC contract. (*See* Keach Cert. ¶ 6 ("[T]he Nevada Athletic Commission will be ordering, among other things, that Main Events pay forthwith the entire amount of the undistributed portion of the purse of Oliver McCall to the Nevada Athletic Commission for disposition that the Nevada Athletic Commission shall, in its discretion, deem [ ] to be in the best interests of legitimate sport.")).

It is unclear, however, that the NAC has jurisdiction to resolve disputed claims to the funds at issue. The disciplinary action before the NAC was brought pursuant to Chapter 467 of the Nevada Revised Statutes. The relevant provisions give the NAC the authority to revoke or suspend boxing licenses and to impose fines. For example, Nev. R. Stat. § 467.158, titled "Reinstatement of revoked license; penalty in lieu of revocation; recovery of costs and fees," provides:

1. Except as otherwise provided in subsection 3, upon receipt of an application and the payment of a penalty prescribed by the commission, not to exceed $250,000, the commission may reinstate a revoked license.

2. Except as otherwise provided in subsection 3, in lieu of revoking a license, as provided for in this chapter, the commission may prescribe a penalty not to exceed $250,000.

3. If the revocation or proposed revocation relates to:

---

15. DKP argues that Main Events's obligation to McCall is wholly separate and apart from its obligation to Time Warner and therefore that interpleader is inappropriate. DKP's position has conceptual appeal: there are separate contracts at issue and the "stake" in this case is a fungible good—money. Hence, DKP's oft-repeated assertion during oral argument that McCall does not care whether his purse money comes from the account maintained in the Bergen Commercial Bank or from Main Events's general accounts. DKP's argument, in the Court's view, proves too much. Because money is a fungible commodity, no claimant on a money stake cares about the origin of the money. What really matters is whether a party fears double

liability on what amounts to one obligation. Here, though there are, as DKP points out, two contractual relationships (one between Main Events and McCall, and the other between Time Warner and Main Events), both contractual relationships involve the same transactional set of facts. That is, Time Warner's claim against Main Events is based on the same set of operative facts—whether McCall engaged in an honest exhibition—as is Main Events's claim against McCall. Based on this crucial circumstance, the Court concludes that Main Events has a bona fide fear of double liability and inconsistent verdicts justifying the invocation of this Court's interpleader jurisdiction.

(a) The preparation for a contest or an exhibition of unarmed combat;

(b) The occurrence of a contest or an exhibition of unarmed combat; or

(c) Any other action taken in conjunction with a contest or an exhibition of unarmed combat,

the commission may prescribe a penalty not to exceed $250,000 or 10 percent of the purse for that contest or exhibition, whichever amount is greater.

4. If a penalty is imposed pursuant to this section, the costs of the proceeding, including investigative costs and attorney's fees, may be recovered by the commission.

Chapter 467 does not appear to give the NAC authority to resolve conflicting claims over the funds at issue.[16] Further, even if the NAC has jurisdiction to resolve the disputed claims to the fund, it seems manifestly unfair to other interested parties to resolve their competing claims over this substantial sum when they are not parties to the action and have not been afforded the opportunity to participate in settlement negotiations between the NAC and McCall.

The pending NAC proceedings, therefore, cannot be said to provide an "adequate remedy" for all the parties for the simple reason that all the parties before this Court are not before the NAC.

Main Events has not sought, on this motion, an Order enjoining the Nevada disciplinary action from proceeding. Rather, it takes the position that, should the NAC Order the funds be transferred to it pursuant to the NAC contract, that the NAC will become another "claimant" on the res.

It does not appear likely that the Nevada action will dispose of the claims relating to the disputed purse. Because the NAC proceedings do not provide an adequate alternate forum for Main Events's interpleader action, the Court will not abstain in favor of the NAC proceeding.

**16.** At oral argument, the parties disputed whether, under Nevada law, a non-party has the right to judicial review of the NAC decision.

**17.** Main Events attempts to create a hybrid version of interpleader by picking and choosing elements from rule and statutory interpleader

**D. *DKP's Argument That This Court Lacks Personal Jurisdiction Over McCall***

McCall argues that this Court lacks jurisdiction over his person. The Court disagrees.

■ Main Events first argues that personal jurisdiction over McCall is proper pursuant to 28 U.S.C. § 2361 which provides for nationwide service of process in actions brought pursuant to 28 U.S.C. § 1335. *See NYLife Distributors, Inc. v. Adherence Group, Inc.*, 72 F.3d 371, 375 (3d Cir.1995). The Court agrees that it may exercise personal jurisdiction over McCall pursuant to Section 2361, at least with respect to Main Events's statutory interpleader claim.

It is unclear from Main Events's pleading, however, whether it is proceeding pursuant to Rule 22, in which case the action cannot be maintained unless the claimants can be served with process as in any other civil action within the territorial limits prescribed by Fed.R.Civ.P. 4, or 28 U.S.C. § 1335, in which case Section 2361 would permit nationwide service of process. *See* 7 Charles A. Wright & Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 1703 at 499 (1986 & 1996 supp.)(discussing differences between statutory and rule interpleader).[17]

The Court concludes, at least preliminarily, that the Court has personal jurisdiction over McCall with respect to Main Events's rule interpleader claim under the line of cases initiated by *International Shoe*. Thus, even if the proposed interpleader action is pursuant to Fed.R.Civ.P. 22, the Court has personal jurisdiction over McCall.

A federal court can exercise jurisdiction over a nonresident defendant to the extent authorized by the law of the forum in which that court sits. Fed.R.Civ.P. 4(e); *Carteret Sav. Bank, FA v. Shushan*, 954 F.2d 141, 145

that it deems favorable to its position. Main Events's efforts to proceed under "rule-atory" interpleader, while creative, must fail. As made clear in the text of Rule 22, its remedy "in no way supersedes or limits the remedy provided by Title 28, U.S.C. §§ 1335, 1397 and 2361."

(3d Cir.1992). Therefore, this Court must apply New Jersey's long arm rule, which extends to the full limits of the Fourteenth Amendment of the U.S. Constitution. N.J. Ct. R. 4:4–4, *Starline Optical Corp. v. Caldwell*, 598 F.Supp. 1023, 1025 (D.N.J.1984).

Under the Fourteenth Amendment's Due Process Clause, personal jurisdiction exists where the plaintiff shows that the defendant has sufficient "minimum contacts" with the forum state. *Asahi Metal Ind. Co. v. Superior Court*, 480 U.S. 102, 108–09, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987) (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985)). "Jurisdiction is proper ... where the contacts proximately result from actions by the defendant *himself* that create a 'substantial connection' with the forum State." *Burger King*, 471 U.S. at 475, 105 S.Ct. 2174 (quoting *McGee v. International Life Ins. Co.*, 355 U.S. 220, 223, 78 S.Ct. 199, 2 L.Ed.2d 223 (1957)) (emphasis in original).

Applying these constitutional standards, the Supreme Court has drawn a distinction between two types of personal jurisdiction: general and specific. *Helicopteros Nacionales de Colombia v. Hall*, 466 U.S. 408, 414, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984), *accord Starline Optical*, 598 F.Supp. at 1025.

General jurisdiction exists where a defendant's contacts with the jurisdiction are so "continuous and systematic", *Helicopteros*, 466 U.S. at 416, 104 S.Ct. 1868, that the defendant can "reasonably anticipate being haled into court there" for any purpose. *World–Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297–98, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980). The level of contacts required for exercising general jurisdiction is significantly higher than for the other type, specific jurisdiction. *Provident Nat'l Bank v. California Fed. Sav. & Loan Ass'n*, 819 F.2d 434, 437 (3d Cir.1987).

Alternately, a court may exercise specific jurisdiction where the cause of action arises from or is related to a defendant's contacts with the forum. *Id.; Starline Optical*, 598 F.Supp. at 1025. "When a controversy is related to or 'arises out of' a defendant's contacts with the forum ... a 'relationship among the defendant, the forum, and the litigation' is the essential foundation of *in personam* jurisdiction." *Helicopteros*, 466 U.S. at 414, 104 S.Ct. 1868 (quoting *Shaffer v. Heitner*, 433 U.S. 186, 204, 97 S.Ct. 2569, 53 L.Ed.2d 683 (1977)).

Once the issue of personal jurisdiction has been raised, it becomes the burden of the party asserting a claim to prove, by a preponderance of the evidence, facts sufficient to establish personal jurisdiction. *Carteret*, 954 F.2d at 146, *McNutt v. General Motors Acceptance Corporation*, 298 U.S. 178, 181–83, 56 S.Ct. 780, 80 L.Ed. 1135 (1936). Moreover, a claimant is required to sustain its burden through sworn affidavits or other competent evidence; a plaintiff cannot rely, at any stage, solely upon the pleadings in order to withstand an in personam jurisdictional attack. *Stranahan Gear Co., Inc. v. NL Indus.*, 800 F.2d 53, 58 (3d Cir. 1986), *Time Share Vacation Club v. Atlantic Resorts, Ltd.*, 735 F.2d 61, 67 n. 9 (3d Cir. 1984).

First, the letter of credit issued to McCall was established in New Jersey with the Bergen Commercial Bank. (*See* English Aff. Ex. A). By its very terms the letter of credit would have required McCall, had he desired to draw on the letter of credit, to be physically present at the New Jersey bank, and to provide the following documents:

(1) a signed statement that payment had not been received from New Jersey Sports Productions, Inc.;

(2) a sight draft signed by Oliver McCall;

(3) a copy of an article from a major newspaper reporting that the Lewis–McCall bout took place;

(4) a copy of the contract between New Jersey Sports Productions, Inc. and Oliver McCall and an affidavit signed by McCall that the contract has not been breached;

(5) an affidavit signed by McCall that the scheduled bout took place; and

(6) the original of the letter of credit.

(English Aff. Ex. A).

It is clear that this Court may exercise personal jurisdiction over McCall on these facts. That the letter of credit contemplated McCall's physical presence in New Jersey to

consummate the terms of the parties' contractual agreement suffices to establish specific personal jurisdiction over McCall. *See Govan v. Trade Bank & Trust Co.*, 109 N.J.Super. 271, 275, 263 A.2d 146 (App.Div. 1970)("... it is readily apparent to us that the facts in this case support jurisdiction of our courts over defendant. This action, although involving two nonresidents, is based upon a promissory note, negotiated, executed and payable at a bank within this jurisdiction."); *cf. Lebel v. Everglades Marina, Inc.*, 115 N.J. 317, 558 A.2d 1252 (1989)(defendant, who sold a boat to a New Jersey resident, subject to suit in New Jersey; seller telephoned buyer in New Jersey, mailed contract to buyer in New Jersey for signing in New Jersey, knew that boat would be shipped to New Jersey, and accepted payment from buyer, a New Jersey resident); *see also Tichenor v. Roman Catholic Church of Archdiocese of New Orleans*, 32 F.3d 953, 958–59 (5th Cir.1994)(consistent with due process to exercise personal jurisdiction over non-resident defendant who makes contract with resident to be performed at least in part within the state).

Accordingly, the Court rejects McCall's argument that the Court lacks personal jurisdiction over him.[18]

### E. *Main Events's Application to Enjoin Other State Proceedings*

█ Main Events also seeks an injunction restraining any other actions affecting the funds involved in this interpleader. Under either rule or statutory interpleader, an injunction is appropriate. Accordingly, the Court **grants** Main Events's motion seeking to restrain other actions affecting the funds involved in this interpleader.

█ 28 U.S.C. § 2361 acts as a statutory exception to the Anti–Injunction Act. Section 2361 authorizes a district court to enter an order restraining all claimants from instituting a proceeding in any state or federal court affecting the interpleaded res. *Provident Mut. Life Ins. Co. of Philadelphia v. Ehrlich*, 508 F.2d 129 (3d Cir.1975). Because statutory interpleader allows for nationwide service of process, 28 U.S.C. § 2361, an injunction issued under Section 2361 halts any proceedings deemed to be inconsistent with the statutory interpleader proceeding.

█ The Court may also enjoin parallel proceedings when the action is pursuant to Rule 22; the scope of the injunction, however, is narrower than under statutory interpleader. Under rule interpleader, the Court retains the discretion to restrain the litigants before the Court from litigating claims in derogation of the Court's exercise of jurisdiction. 7 Charles A. Wright & Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 1717 at 615 ("... the mere fact that a nationwide injunction under Section 2361 is not available in a rule interpleader case does not mean that the court does not have discretion in the latter context to issue an order against those claimants that have been subjected to the court's jurisdiction in accordance with the more traditional rules of process applicable in cases under Rule 22. Certainly if the court can assert personal jurisdiction over a claimant it has the power to issue an order designed to effectuate the exercise of jurisdiction.").

The Court, accordingly, **grants** Main Events's motion to restrain any other actions affecting the funds involved in this interpleader. Moreover, because the Court has determined that the case may proceed as a statutory interpleader, the injunction applies to any proceeding nationwide that the Court deems inconsistent with this interpleader proceeding.

### F. *DKP's Argument That the NAC is the Designated Forum for Resolving this Dispute*

█ Finally, DKP argues that the NAC is the exclusive forum for resolution of the parties' dispute. The Court disagrees.

---

**18.** McCall dedicates only one page of his opposition brief to his argument that this Court lacks personal jurisdiction over McCall. For the reasons set forth above, the Court preliminarily determines, on the facts before it, that the Court may, consistent with "traditional notions of fair play and substantial justice," *International Shoe v. State of Washington*, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945), exercise personal jurisdiction over McCall. If McCall wishes to contest this Court's personal jurisdiction further, he may do so, but must fully brief the issue.

DKP bases its argument on one paragraph of a form contract, the NAC contract, entered into on the day of the scheduled bout, and which was not even signed by Mr. Adams, one of the parties to it. (*See* Complaint Ex. C). The pertinent language of the NAC contract is contained in Paragraph 3 and states:

> [The parties agree] [t]hat the contest . . . shall be conducted in all respects in conformity with the laws of the State of Nevada, and the rules and regulations adopted by the Nevada Athletic Commission, which are hereby made a part of this agreement. . . . If the referee or the Nevada Athletic Commission shall decide that the Boxer and Manager, or either of them, did not enter into the contract in good faith; or the Boxer and Manager, or either of them, had any collusive understanding or agreement regarding the termination of the match other that the same should be an honest exhibition of skill on the part of the contestants, or that the Boxer is not honestly competing or did not give an honest exhibition of his skill, or is guilty of an act detrimental to the interest of boxing; it is agreed in any of such events that the Boxer shall not be entitled to the compensation above named, or any part thereof, unless so ordered by the Nevada Athletic Commission.
>
> It is further agreed that the Promoter [Main Events] shall pay said compensation to the said Commission in the event the Commission shall so order upon any of the above-mentioned grounds. The Commission shall thereupon, in its discretion, make such disposition of said purse as it deems to the best interest of legitimate sport and may forfeit to the Nevada Athletic Commission all or any part of the compensation or order the same or any portion thereof paid to the Boxer. All parties hereto agree to accept and be bound by the decision of the said Commission and such decision shall be final and conclusive of the rights of the parties hereto.

The NAC Contract must be read *in pari materia* with the other contracts entered into by the parties. In particular, the WBC Con-

tract indicates a desire on the part of the parties to have their disputes resolved by the New Jersey Superior Court. (*See* Complaint Ex. B at 6). Especially in light of the limited jurisdiction of the NAC, the Court doubts that the parties intended to be bound to submit all their contractual disputes to the NAC. Accordingly, the Court concludes that the NAC is not the exclusive forum for litigating the rights of the parties emanating from the contracts at issue.

### III. *CONCLUSION*

For the foregoing reasons, Main Events's motion for an Order: (1) permitting Main Events to pay into the Court registry the sum of $3,003,923.04 together with accrued interest, in connection with an interpleader action brought by Main Events; (2) directing that claims on the alleged fund be filed; and (3) restraining any other actions affecting the funds involved in this interpleader (except a disciplinary action brought by the Nevada Athletic Commission against the Defendant, Oliver McCall) is **granted.**